It's 20-1062 Horal v. IHR, Inc., and we are ready to proceed whenever you are. Thank you. Thank you, Your Honor. May it please the Court, my name is Richard Barkley, and I am appearing today on behalf of the appellant, Jennifer Horal. Now, a little more than a month after Ms. Horal began working for the appellee, IHR, it held a team meeting, a team meeting exercise for sales managers and consultants from all of the Mike Ward dealerships. As part of that exercise, the sales force was divided into teams and played family feud. During that game, the following question was asked. What does someone need to do other than work harder in order to get a promotion at work? The top answer was either sleeping with or dating the boss. Three days later, after a weekend, Ms. Horal complained about the answer, first to the owner of the dealerships, Mike Ward, and then to the general manager of the Infinity dealership, Ido Kim. The reason she complained to Mr. Kim was because he had led the team building exercise. Twenty-two days after the complaint of Mr. Ward and 15 days after the complaint of Mr. Kim, Ms. Horal was discharged purportedly for poor sales performance. And the issue in this case is, viewing the facts and drawing reasonable inferences in the light most favorable to Ms. Horal, does she present sufficient evidence to create a genuine issue of material fact that the reason given by IHR for her discharge or performance was pretextual? And I want to make sure we're focused. That's the only issue here. We have a concession. There was a prima facie case and a concession going the other way that they raised a non-discriminatory reason for termination. So all the focus is on pretext. Is that correct? Now, a plaintiff can create a genuine issue of material fact by revealing, quote, weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction in the employer's proffered legitimate reason for its action, such that a fact finder could rationally find them unworthy of credence. The Infinity Dealership, Peter Kim, and the, excuse me, Your Honor. Now, in the trial court, Ms. Horal identified four facts that would allow a jury reasonably to infer that IHR's reason was not credible. First, she showed that she was fired 22 days after she complained to Mr. Ward and 15 days after she complained to Mr. Kim. Now, this very close temporal proximity between Ms. Horal's complaint and her subsequent discharge is not dispositive on the pretext issue. It is, however, probative evidence that, combined with other evidence, can meet the threshold for establishing pretext. And here, evidence of temporal proximity is not Ms. Horal's only evidence of pretext. And the district court erred in not finding that other evidence, along with the temporal proximity, was sufficient to raise a material question on the issue of pretext. Now, the court's error can be seen in three rulings. In three rulings, the court made in its grant of summary judgment. First, it erred in concluding that another employee… Before you go there, you said there were four arguments she made that it was pretextual, and you've told us about temporal proximity. Can we first finish listing what… Oh, sure. I'd be happy to. The second one, Your Honor, is the court used another employee, Juliana Leach, as a comparator when she was not. Okay. The second one is that the court calculated the time that Ms. Horal had been working for IHR to be three months when it was actually two months. And that makes a big difference when you compare her performance with the performance of other sales reps. And then the last one has to do with the disruption in her phone services. She had a week or so period when, for some reason, her phone wasn't working and IHR couldn't get around to fixing it. And that, we argue, is also evidence of pretext. Okay? Thank you. Sure. Now, as I said, the court concluded that another employee, Ms. Juliana Leach, was a comparator with Ms. Horal, and thus IHR's different treatment of Ms. Leach can only be ascribed to their difference in car sales. One of the things I'm confused on with that is that in terms of making the termination decision, Mr. Thummel, who, I guess, made the decision, didn't compare Ms. Horal to Ms. Leach. He compared instead to two other employees. Should that be a concern? We're reviewing DeNovo, aren't we? Yes, you are reviewing DeNovo. And the court decided that Ms. Leach was a proper comparator and used that to determine that Ms. Horal was discharged because of her lack of sales. So I think that, in fact, and by the way, just so it's clear, we don't accept the fact and we don't believe the court should accept the fact that Mr. Thummel was the sole decision maker. As we've shown in the briefs, Mr. Ward was involved in at least three different meetings, and the court should be skeptical of sort of facts that can't be proven or disproven by any particular... To the court, it was. Yes, absolutely. No, I mean evidence that the decision to terminate her was based on a comparison to Ms. Leach as opposed to the two male sales people that Mr. Thummel testified he compared her to. I don't know whether there's any evidence in the record about whether or not he compared her to Ms. Leach. Okay. Well, Counselor, before you move on, can I just ask you, the second part of that analysis was, at least at the time when they let her go, was that actually she was very experienced and maybe should be compared to more experienced people who were selling more vehicles. Can I get you to address that point? Sure. That's kind of a post hoc justification. Surely there's no evidence in the record that IHR believed it could hold Ms. Horrell to a higher standard than its other employees. And if you look at the comparisons it makes with the other employees, it doesn't say, well, this employee had three months' experience and this employee had eight months' experience, and this one had two years' experience, and therefore we ought to hold him to a higher standard. So there's no evidence that that was a motivating cause for her termination. In other words, there's no evidence that had she sold two more cars or three more cars or whatever, that she still would have been discharged because she was more experienced than they expected her to jump right out of the gate. Is that it? Yeah, thank you. Okay, sure. Let me focus you on the disruption in phone service for a moment. Sure. Did you come forward with any evidence that this disruption was intentional, or is that something you thought was a proper inference that because her phone didn't work for a week, it must have been intentional and retaliatory? Well, Your Honor, if you look at her affidavit, what Ms. Horrell says is, and let me just quote, at some point after my meeting with Mike Ward, my sales phone quit receiving sales calls. My phone was still able to receive and make calls, so it was not broken. It just stopped receiving sales calls. The way the process worked is that sales calls went out simultaneously to the salespeople's phones in their offices. Whoever picked up the fastest got the sales call. Because my phone did not receive sales calls, I did not get any of them. I tested my phone by calling the dealership and pretending I was a potential Maserati buyer. When the sales call went out, the other sales phones rang, but mine did not. So that clearly establishes that there was a problem with her phone. My question goes beyond that. My question goes, was there any evidence that was presented in opposition to summary judgment that somehow the dealership did this intentionally? Your Honor, I would say this is kind of a res ipsa loquitur. Okay. Situation where the dealership exercised control of the phone and control over the method for sales calls. The fact that it was done for some unknown reason does not, I think, preclude an inference that, in fact, it was because of the dealership. Your Honor, I have three minutes left. Can I reserve them, please? Yes, you may. Thank you. Mr. Rogers, you're muted. You have to unmute. That's going to make me very unpersuasive. Maybe not. Sometimes silence is golden, right? Good morning. Good morning. May it please the court. This is a very narrow issue in an employment case. The plaintiff was discharged and she brought exclusively a Title VII retaliation case, as this court knows. And that issue before the trial court was whether the plaintiff presented sufficient evidence in the summary judgment context to establish that the conceitedly legitimate and nonretaliatory reason for plaintiff's termination was pretextual. She was required to come forward with evidence to link or couple the temporal proximity of her termination with some other circumstantial evidence of retaliatory motive on the part of the defendant. And this is a linkage that she simply failed to even come close to making. This court, like the trial court, must thus determine whether a reasonable fact finder could conclude that defendant's legitimate reason for her termination, her poor performance, poor production, her poor effort, is pretextual and unworthy of belief. The trial court found that she failed in satisfying this burden. It found no reasonable jury could reach such a conclusion and that there was no question of material fact. And this court, in de novo review, should reach the same determination. The starting point... Let me ask you a question about how you calculate her sales for purposes of comparison. I think it's uncontested that she was not allowed to sell cars until September 7th. She wasn't licensed to sell automobiles until September 7th. Doesn't that suggest that the proper calculation of her month of hire and her first full month are that it's September and October is her first full month? The analysis and the comparison of her performance with other employees' performance, of course, invariably involves the number of units sold in a given month. It's a car dealership. Like other employees, and there's no evidence in the record on this because it frankly wasn't the subject of discovery or argument to the court. But employees start at a car dealership and they complete paperwork. And unless they're transferring from another job where they were licensed to sell vehicles, they don't have a sales license. They have to go through the process of applying for and getting a sales license. Ms. Harral, the plaintiff, did that, and other employees who were hired as sales consultants would have done that as well. To your point, it's uncontested that she did not receive a license until September 7th. And so she could not legally sell automobiles until September 7th? That is correct. That's undisputed. Well, I don't know how you then can count against her automobiles she didn't sell in August. I think the reason is because no employee walks in the door, as I indicated, with a sales license. And so there's always going to be a certain amount of delay. And as plaintiff argued substantially to the trial court, she had all sorts of training that she needed to do. And of course, that's the kind of thing you would expect an employee to do on the front end of one's employment is getting accustomed to the new job. If there's new product information, you need to do that. If there's something unique to the dealership, you need to do that. But to your point, she could not sell a vehicle lawfully in Colorado until she had a sales license. That's true. Nor could any other employee in the dealership after they start employment. Well, there's no evidence that I could find or I don't see, you can point me to it, that when you're comparing them, that you're looking at the other people before they could sell an automobile. And it makes no sense to me to hold someone accountable for not selling automobiles in a month where she wasn't allowed to sell automobiles as a matter of law. There's no evidence in this record as to when each new employee at IHR, Inc., after their hire, obtained their sales license. That's not in the record. That's not available for your review. That's just a fact. It wasn't something that was raised by plaintiff below, and it wasn't something that was the subject of discovery or argument to the trial court. In terms of the actual pretext analysis, which is what this case is about, plaintiff had the obligation to come forward with some evidence linking her October 10, 2016, protected activity and expressing concerns to Mike Ward about the family feud presentation with Robert Thummel's November 1, 2016, decision to terminate her employment for poor performance and lack of effort. This is the causal connection that plaintiff was obligated to come forward with evidence about. Robert Thummel was her direct supervisor. He was the sole decision maker with respect to her termination. This is undisputed. Argument of counsel notwithstanding, this is undisputed. He reached a decision because of her poor performance and his perception of her lack of effort. This, too, is undisputed. There's no evidence to the contrary. There is only argument. She sold three cars in the entirety of her employment. This also is undisputed. Whether her commencement date of employment is August 29, September 6, whether she is evaluated on two months or three months, she sold three cars during the entirety of her employment. And her production and her performance was below others at the Maserati dealership and below others hired at IHR historically in terms of new employees when they come in the door. Her production was specifically below the performance of three other sales consultants hired by IHR at approximately the same time. And that would be Ms. Leach, about who you have heard much argument. But more crucially, I think, it's also true with respect to Mr. Khalil and Mr. Rice, who were hired to work at the Maserati dealership on August 8, 2016. And so their performance is evaluated in August and September or October. And that is the comparador that was available to the district court to review. Well, what about the other? There's, I see Ricardo Banegas, who had three at the end of his first full month. Brandon Gialapas, Barbara Rose Miller, Michael Seymour, Robert Skanklin, Thomas Van Bank, Christopher Vitale. It looks to me like all of them were performing at or below where Ms. Hora was, and they were not terminated. There was substantial discovery in this case about the performance of new hires at IHR, both at the Maserati store. It's lumped together as one dealership. There's other brands there and at the Infinity store. And that data was presented to the district court, and both sides presented argument about it. The actual performance of those employees at the different stores is discussed, frankly, in substantial detail. I think in the answer brief that I filed at pages 30 to 32, and I don't claim to have committed Mr. Banegas or the other various employees, their various performance in the month of their hire. But I think in order to be able to meaningfully compare the performance of those employees, about whom we have no information as to when, as you mentioned earlier, a sales license might have been obtained, from an apples-to-apples standpoint, the district court reasonably compared their month of hire, the month of hire of Ms. Horale, and looked at performance on that basis. And under any analysis in terms of that comparison, which is as close to an apples-to-apples comparison as one can make, plaintiff's performance and her treatment by IHR Inc., collectively, is no different than any of those employees were treated. In other words, if someone comes in and in their first month or two sells only three vehicles, they're not going to remain employed. They're either leaving on their own or they're being asked to leave. And the data from other employees across all of the dealerships, not just at the Maserati store where Mr. Thummel was a supervisor in 2016, but the data fully supports the consistent treatment that IHR Inc. has meted out to other employees over the years. Well, the data supports it if you assume that they're counting before you could sell an automobile, right? I think the data is based on month of hire, Your Honor. It can't be based on the date of sales license procurement because that information just simply wasn't available. That would be an extraordinary amount of data. It wasn't sought in discovery. It wasn't presented to the trial court. So it's not something that's in the record or available for review. But it's a different date, and I would agree with you. It's conceivably a different date for every employee that starts. Somebody that starts on the 8th of August, for instance, may not get a sales license until the 16th of August. Can't sell cars in that first week. That's a fact. But we don't have that data in this record. Well, is it an issue of material fact that needs to be resolved at trial? I don't think it is. And if for no other reason, then we have two employees who were hired in August of 2016, August 8th, Mr. Khalil and Mr. Rice. Even if plaintiff, as she claimed, not commence work until September 6th, 2016, her performance compared to those two employees that her supervisor would have been reviewing, Mr. Khalil and Mr. Rice, was substandard. Mr. Khalil sold four cars during his first two months of employment, regardless of when he received his sales license. Mr. Rice sold six vehicles during his first two months of employment, August and September. The plaintiff sold only three vehicles, even giving her a start date of September 6th, instead of August 29th, which is what all of the records reveal. Even giving her the benefit of that argument that she started on September 6th, her performance was nonetheless below the performance of the other two new hires at the Maserati dealership. And this is so, as Judge Aide made reference, this is so despite her five years of experience. When she was hired, and this is again an undisputed fact in the record presented to the district court. When she was hired, Mr. Thummel reviewed her experience, and that was part of the appeal of hiring someone like her. She had five years of success selling automobiles, should have been able to come in and perform without the same level of hand-holding and training that a new hire might. So when he reviewed her performance and saw that it was substandard, even compared with two new employees who'd never sold a car in their life at that same store, she came up lacking. And when he reviewed that performance, coupled with his own observations of her lack of effort, her lack of engagement in the process, and her unwillingness to follow the established sales procedures that were in place at this dealership, he made the determination independently that she was not performing and that she should be terminated. That's the determination, that's the decision that must be evaluated here because it is the decision of the manager or the decision maker that has to be reviewed and his perception of her performance that must be subject to the pretext analysis. And that's the Zimbo case from this court, and also a more recent case in August, Robinson versus Barrett, evaluating that very issue. And that is where plaintiff simply cannot present evidence to establish that linkage, that pretextual linkage that is necessary. And the district court determined that no rational fact finder could find that explanation unworthy, and plaintiff has presented no argument to the district court or to this court to overturn that determination. Before you run out of time, I'd like you to address the argument that somehow her phone was disabled. Did they come forward with evidence, I guess, of sabotage or intentional disruption, and do they have to do that to survive? In the Rule 56 context, as this court is well aware, plaintiff is entitled to reasonable inferences from the evidence that is presented to the court. What plaintiff is not entitled to is speculation, surmise, and conjecture. That is not part of the Rule 56 analysis. In her affidavit, plaintiff contends that her phone did not work for a week. Okay. I mean, we will take that at its word for purposes of a Rule 56 analysis, but that is the extent. To take that back to the extent it must be considered as one, to any level beyond that, to establish any type of intentional retaliatory disconnect of a phone or tampering or sabotage with a phone is not the type of inference that a plaintiff is entitled to or a nonmovement is entitled to when resisting a summary judgment motion. And the district court readily dismissed that as not being an appropriate inference, but rather conjecture on the part of counsel. And this court should, too. This court should, too. I am getting—time goes fast. Time goes fast. One thing I did want to raise, one of the issues the plaintiff suggested in the briefing here was that she had raised the proper comparator argument as recognized by the court in Herrera, and she didn't. I mean, the only arguments raised about the comparison to Juliana Leach—and again, IHR is the employer of all of these employees, so the performance and the treatment by the defendant of employees throughout the dealership, the defendant suggests anyway, is relevant to determining pretext. Did we treat her differently at the Maserati store or as a whole than we treated our other employees? But at the trial court, plaintiff argued that the quality of the complaints made by Ms. Leach was different and that they sold different kinds of vehicles. And that was demonstrated quite clearly to not be true, given the actual sales that she had. But plaintiff now suggests that because they had different supervisors and other issues that fall within the Herrera proper comparator argument, that Ms. Leach should not be considered—should not have been considered by the trial court and should not be considered by this court. But if we take that argument to its logical conclusion, the only proper comparators then would be Mr. Khalil and Mr. Rice, who were both working at the Maserati dealership. Because all of the data, all of the historic data about other new employees and how they were treated, there's no basis whatsoever to consider that that would have been the same comparator. Different stores, different supervisors, different timeframes, different years. So plaintiff's argument, if the proper comparator issue has been properly raised, would essentially eliminate the propriety of any comparison of other sales consultants other than Mr. Khalil and Mr. Rice. Because when Mr. Thummel made his decision, he's in charge of the Maserati store. He's looking at who's working in that store. Most of the sales consultants are selling 14 to 26 vehicles during that two-month period. Ms. Harral sold three. And the two brand-new employees with zero experience sold four and six in those two months. More, if you properly consider her start month to be August, which is what the district court concluded and which I would submit this court should conclude. And I am read. Thank you very much. We would request that the district court's decision be affirmed and the appeal dismissed. Thank you very much.  Thank you, Your Honor. I would like to point out initially that there's an inherent inconsistency between the comparator similarly situated issue. On one hand, they argue that Mr. Thummel was the sole decision maker with respect to Ms. Harrell. And on the other hand, they did turn around and argue that when comparing her and Ms. Leach, they should be viewed. He should be viewed as a supervisor. And if he's not making a decision with respect to the termination, then he certainly would not be considered a supervisor for that purpose. When did you first raise the not the same supervisor argument? Your Honor, it's in the our answer brief in the trial court. It's cited in in my brief. I believe it's maybe pages 31 through 35, something like that. Maybe 31 to 35 in your answer brief in the trial court or in your brief before us. Oh, yes, Your Honor. It was raised in the trial court. And I'm and please don't. Those may not be the right pages. I don't have the briefs in front of me. But it was raised. So the trial court, in fact, there was a specific heading that was Ms. Leach was not a proper comparator. And there were, I believe, three pages of argument on that issue in the trial brief. So it was not. So it was definitely raised in the trial brief. And that's part of why, you know, the court relied so heavily on the Juliana Leach comparison in the court before you. It was raised and discussed extensively in the opening brief. Before us? Yes, before you. It's interesting that opposing counsel raises Mr. Khalil as one of what he would consider an appropriate or legitimate comparator. Mr. Khalil sold two cars this first month. Two cars. Mr. Khalil was somehow a super much superior than Ms. Horrell. If she'd been given a third month and then, and his sales had continued to be better than hers, maybe them. But she was never given that time. Thank you, Your Honor. Counsel, can I just ask you, who do you think is a proper comparator? Are there no proper comparators? Well, we did not object to using basically the raw numbers of just looking at the sales by different sales representatives for the first two months. And doing that, we identified 10 salespeople who were, had equal or lower sales than she did. So if we use what they, basically the information they provided, then basically we compare the sales, whether they're true comparators or should be true comparators. That's an interesting question. I would think that it would be much harder to sell vehicles at a Maserati dealership than it would at an Infiniti dealership or an Alfa Romeo. So it may be that she's inherently handicapped by using those salespeople from other sales, other dealerships. But for the purposes of the brief, we accepted the numbers they provided and showed that if they are proper comparators, that she performed as well or even better than at least 10 of the other people. Thank you. You're out of time. Thank you. We will take this matter under advisement.